[Cite as *State v. Irwin*, 2011-Ohio-999.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | ) | CASE NO. 09 MA 137 |
| | ) | |
| PLAINTIFF-APPELLEE | ) | |
| | ) | |
| VS. | ) | OPINION |
| | ) | |
| SHANNON R. IRWIN | ) | |
| | ) | |
| DEFENDANT-APPELLANT | ) | |

CHARACTER OF PROCEEDINGS:    Criminal Appeal from the Court of
Common Pleas of Mahoning County,
Ohio
Case No. 04 CR 1031

JUDGMENT:                            Affirmed.

APPEARANCES:
For Plaintiff-Appellee:               Atty. Paul J. Gains
                                      Mahoning County Prosecutor
                                      Atty. Ralph M. Rivera
                                      Assistant Prosecuting Attorney
                                      21 West Boardman Street, 6th Floor
                                      Youngstown, Ohio 44503

For Defendant-Appellant:             Atty. Douglas A. King
                                      Hartford, Dickey & King Co., LPA
                                      91 West Taggart Street
                                      P.O. Box 85
                                      East Palestine, Ohio 44113

                                      Shannon Irwin, Pro se
                                      #63125
                                      Ohio Reformatory for Women
                                      1479 Collins Avenue
                                      Marysville, Ohio 43040

JUDGES:
Hon. Cheryl L. Waite

Hon. Joseph J. Vukovich
Hon. Mary DeGenaro

Dated: March 4, 2011

WAITE, P.J.

{1} Appellant, Shannon Irwin, appeals the judgment of the Mahoning County Court of Common Pleas denying several post-judgment motions and imposing maximum, consecutive eight-year sentences on three counts of felonious assault, violations of R.C. 2903.11(A)(1), felonies of the second degree, at a resentencing hearing conducted on August 6, 2009. Appellant was convicted of assaulting Edward Hoopes, who was at the time in an advanced stage of amyotrophic lateral sclerosis ("ALS"), a debilitating and ultimately fatal neuromuscular disease. Appellant was Hoopes' fiancé and state-appointed caretaker.

{2} Appellant was arrested in the early morning hours of July 7, 2004, after the police were called to her home and found Hoopes suffering from multiple injuries, including numerous bleeding facial lacerations. Neighbors called the police because they had heard someone crying in Appellant's home for several nights in a row. When Officer Michael Porter asked Hoopes what had happened, Appellant intervened, repeatedly saying "[t]ell him you fell." (Tr., p. 349.) Appellant told Porter that Hoopes had fallen. (Tr., p. 349.) Porter testified that Hoopes was "scared to death," and that he wept as he told Porter that he did not want to go to jail. When Hoopes was assured that he would not be arrested, he confided that Appellant had been abusing him. (Tr., p. 351.) The police called for an ambulance, and

transported Appellant and her then twelve year-old son, T.I., who was living in her home and was present during the assault, to the police department.

{3} Appellant was indicted on September 2, 2004, on one count of felonious assault. A superseding indictment was filed on December 16, 2004, adding two counts of felonious assault, R.C. 2903.11(A)(1), all second degree felonies. The first count charged Appellant for the assault on July 7, 2004. The second and third counts charged Appellant for assaults committed in May and June of 2004, respectively.

{4} The case went to jury trial on December 12, 2005. The state requested that Hoopes' videotaped deposition be admitted into evidence. Instead, the trial court allowed the transcribed deposition testimony to be read to the jury. The court found that the deposition videotape showed Hoopes in such an advanced stage of ALS that it would be unduly prejudicial to Appellant. (Tr., p. 371.)

{5} The state called a variety of other witnesses, including T.I., who was present during all of the charged assaults and actually assaulted Hoopes himself on one occasion. The state's witnesses also included the arresting officers, the EMT who attended to Hoopes on July 7, 2004, Appellant's next-door neighbors, a fellow prison inmate of Appellant, and two of Hoopes' physicians.

{6} T.I., who had lived with his aunt, testified that he resumed visitation with his mother in May of 2004. (Tr., p. 266.) He was twelve years old at the time. That same month, Appellant was able to quit her job to care for Hoopes full time because

the state began compensating her as Hoopes' caretaker. (1/11/06 Sentencing Hrg., p. 25.)

{7}    T.I. testified that Appellant began hitting Hoopes on his arms and chest in the middle of May. (Tr., p. 267.) At that time, Hoopes was confined to a wheelchair. (Tr., p. 267.) T.I. claimed that he saw Hoopes' bruises when his shirt was removed for his "baths." (Tr., p. 267.) According to T.I., Appellant used a garden hose to wash Hoopes in the back yard during the evening. (Tr., p. 268.)

{8}    At first, Appellant struck Hoopes on his chest, arms, and legs with her fists, elbows, and knees. (Tr., p. 269.) As the beatings continued, Appellant told T.I. that she had to use her palms instead of her fists because her hands were hurting. (Tr., p. 270.) Appellant also used an aluminum broomstick to assault Hoopes. (Tr., pp. 272, 291.)

{9}    In June, T.I.'s aunt had surgery so he moved in with Appellant and Hoopes. T.I. testified that his mother beat Hoopes two or three times a week. (Tr., p. 271.) Appellant told T.I. that she beat Hoopes because he was treating her badly and that he looked at other women. (Tr., p. 269.) T.I. testified that Hoopes would apologize to Appellant during the beatings and beg her to stop. (Tr., p. 278.)

{10}    T.I. conceded that he beat Hoopes with a hockey stick on one occasion after Appellant told him that Hoopes had raped her sometime in 2003. (Tr., p. 289.) The alleged rape was never reported. T.I. testified that he was afraid of his mother, based largely upon her treatment of Hoopes, and he feared that she would hurt him if he did not assault Hoopes. (Tr., p. 292.) T.I. stated that Appellant never hit him.

**{11}** Bonnie Greenwalt, a fellow prison inmate who met Appellant at the justice center in October of 2004, testified that Appellant laughed as she recounted the July 7th assault on Hoopes. (Tr., p. 364.) Appellant showed Greenwalt pictures of the injuries that she inflicted on Hoopes during the assault. (Tr., pp. 361-362.)

**{12}** Hoopes suffered extensive injuries, to the point that he received a blood transfusion due to the grave amount of blood loss he suffered as a result of the July 7th assault. According to the testimony at trial, Hoopes had multiple lacerations and areas of bruising, and multiple areas of burns and ecthyma in the chest, back, and genital areas. His entire lower extremities were very swollen and bruised. (Tr., p. 316.) Graphic photographs of Hoopes' injuries were admitted at trial. Dr. Debra L. Lehrer, the telemetry department physician who was the first doctor to treat Hoopes, provided the following testimony regarding his injuries:

**{13}** "On the face, forehead there are multiple puncture lesions that are scabbed over, and some of them were oozing, still oozing. There were multiple bruises over the face area, along the nose, under the eye. There was a cut that was partly scabbed over. On the neck, you can't fully see that, but there were bruises. You can see multiple bruises on the arms. This entire area is old bruising with the difference in coloration that we just talked about. Over the abdomen, there are multiple other areas that were also bruising of different ages. We don't have a picture of the back to describe.

**{14}** "The bottom portion of the body showed multiple areas of laceration where cuts were over the entire area of the legs. That's all bruising. All of the

redness here is bruising in the private area that we can partly see. There were areas of bruising and swelling and drainage and bleeding and lacerations, and this is what I saw when I examined the patient on admission to the hospital." (Tr., pp. 328-329.)

{15} At the original sentencing hearing conducted on January 11, 2006, during her colloquy with the trial court, Appellant stated that she assaulted Hoopes because of the way her treated her during the three years that they were together. (1/11/06 Sentencing Hrg., pp. 25, 42.) Appellant claimed that she intended to leave Hoopes but she "stood by him when he got sick." (1/11/06 Sentencing Hrg., p. 20.) In an effort to justify the beatings, she stated that they never had sex during the three years that they were together, and that when he was in the hospital, he forgot her name and called out the name of a girl he knew twenty years ago. (1/11/06 Sentencing Hrg., p. 44.) The trial court quoted her written statement in which she characterizes the July 7 assault as a "butt whooping." (1/11/06 Sentencing Hrg., p. 47.) The trial court imposed maximum, consecutive sentences. Appellant's conviction was affirmed on direct appeal, however, the sentence was vacated based upon the Ohio Supreme Court's decision in *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470.

{16} Following remand, but prior to the resentencing hearing, Appellant filed several motions, three of which are at issue in this appeal. Appellant filed a motion for new trial predicated on deposition testimony offered in a civil case filed against her and the agencies responsible for entrusting Hoopes to her care. In the motion, Appellant cites the deposition testimony of several of Hoopes' relatives, an agency

employee and a neighbor, who stated that they visited Hoopes in June, 2004, and saw no evidence of abuse. The deponents further stated that Hoopes did not tell them that Appellant was abusing him. Appellant claimed that the evidence was newly discovered because the depositions were not available during the criminal trial. In addition to the motion for new trial, Appellant filed a motion to subpoena the foregoing individuals for the resentencing hearing at the state's expense.

{17} Appellant also filed a motion seeking an expert witness to testify at the resentencing hearing on the subject of peginterferon-induced psychosis. Appellant began a regimen of peginterferon to treat Hepatitis C in March of 2004. (8/6/09 Sentencing Hrg., p. 47.) According to an informational brochure admitted into evidence at the resentencing hearing, the side effects of the drug include neuropsychiatric events such as depression, aggressive behavior, psychoses, and suicidal tendencies. Appellant is a recovering drug addict with a history of depression and suicide attempts. She attributed the July 7th assault to peginterferon-induced psychosis.

{18} The trial court denied all three of foregoing motions. At the resentencing hearing, Appellant claimed that she did not harm Hoopes in May and June of 2004, relying on the deposition testimony from the civil trial. With respect to the assault on July 7, 2004, she alleged that Hoopes was aware that she was taking peginterferon, and that he was verbally abusive and encouraged her to kill herself because he did not want to die alone. (8/6/09 Sentencing Hrg., p. 46.) Although she attributed the assault to peginterferon-induced psychosis, she conceded at the

resentencing hearing that she did not harm herself, or anyone other than Hoopes, while she was taking peginterferon. (8/6/09 Sentencing Hrg., pp. 47-48.)

{19} Appellant claimed at the resentencing hearing that she had to start the peginterferon treatment in March of 2004. However, the medical records attached to her sentencing memorandum show that the treatment could have been delayed or completely foregone. Appellant claimed that she started the year-long regimen of peginterferon because her hepatitis was going to "turn to the next stage of the disease, which makes peginterferon treatment null and void." She claimed that she was "at the end of [her] time for treatment." (8/6/09 Sentencing Hrg., p. 41.)

{20} According to the notes of Appellant's physician, Dr. John S. Park, Appellant's disease was "very mild." (3/29/04 Notes.) Because of Appellant's history of depression, and the serious potential side effects of peginterferon, Dr. Park told her that she could wait for a better treatment or delay treatment until Hoopes' succumbed to his illness. Dr. Parks' notes indicate that "[Appellant] does not wish to defer treatment at this time, despite [his] explanation that probably there would be very little change in her status with waiting." (3/29/04 Notes.) The notes indicate that Appellant was warned about the potential side effects of the drug.

{21} On remand, the trial court imposed maximum, consecutive sentences. This timely appeal followed.

{22} Appellant filed a pro se appellate brief six months before her counsel filed his brief in this case. In the pro se brief, Appellant argues that the trial court abused its discretion when it denied her motion for new trial. She further argues that

the trial court should not have permitted the state to file two responses to the motion for new trial. Her third assignment of error challenges the trial court's rulings on her motion to hire an expert witness, her motion to issue subpoenas at the state's expense, and her motion to expand the record. All of these issues were raised by her counsel in his brief with the exception of the multiple responses to the motion for new trial. In addition to the assignments of error originally raised in the pro se brief, Appellant claims that the trial court abused its discretion when it imposed consecutive maximum sentences in this case, and denied her right to a sentencing jury. For the following reasons, all of Appellant's assignments of error are overruled and her sentence is affirmed.

## ASSIGNMENT OF ERROR NUMBER ONE

**{23}** "THE TRIAL COURT'S DENIAL OF DEFENDANT/APPELLANT'S MOTION FOR A NEW TRIAL WAS AN ABUSE OF DISCRETION."

**{24}** Crim.R. 33(B) states, in pertinent part, "[m]otions for new trial on account of newly discovered evidence shall be filed within one hundred twenty days after the day upon which the verdict was rendered, or the decision of the court where trial by jury has been waived. If it is made to appear by clear and convincing proof that the defendant was unavoidably prevented from the discovery of the evidence upon which he must rely, such motion shall be filed within seven days from an order of the court finding that he was unavoidably prevented from discovering the evidence within the one hundred twenty day period." The parties conceded at oral argument

that Appellant's motion for new trial was filed pursuant to Crim.R. 33(B) and was not a post conviction motion filed pursuant to R.C. 2953.21.

{25} The Supreme Court of Ohio has set forth criteria that must be met for a trial court to grant a motion for a new trial in a criminal case based on newly discovered evidence. The defendant must show that the new evidence:

{26} (1) is likely to change the result if a new trial is granted;

{27} (2) was discovered after the trial;

{28} (3) could not, in the exercise of due diligence, have been discovered before the trial;

{29} (4) is material to the issues;

{30} (5) is not merely cumulative to the former evidence; and

{31} (6) does not merely impeach or contradict the former evidence. *State v. Petro* (1947), 148 Ohio St. 505, 76 N.E.2d 370, syllabus.

{32} Crim.R. 33(B) motions for leave to file a motion for new trial are reviewed for an abuse of discretion. *State v. Pinkerman* (1993), 88 Ohio App.3d 158, 160, 623 N.E.2d 643. An "abuse of discretion" occurs when the court's attitude is unreasonable, arbitrary or unconscionable. *State v. Adams* (1980), 62 Ohio St.2d 151, 157, 404 N.E.2d 144.

{33} In a motion for leave to file a motion for new trial, the petitioner is required to show by clear and convincing proof that he has been unavoidably prevented from discovering, within the one hundred twenty day time limit, the evidence that he is relying on to support his motion for new trial. Crim.R. 33(B); *State*

*v. Parker*, 178 Ohio App.3d 574, 2008-Ohio-5178, 899 N.E.2d 183, ¶16. In other words, the petitioner had no knowledge of the existence of the ground supporting the motion and could not have learned of the existence of that ground within the prescribed time limit through the exercise of reasonable diligence. Id., quoting *State v. Walden* (1984), 19 Ohio App.3d 141, 145-146, 483 N.E.2d 859.

{34} Appellant did not file a motion for leave to file her motion for new trial. We have held that the failure to file a motion for leave is not a jurisdictional defect when the motion for new trial contains proof that the petitioner was unavoidably prevented from discovering the purported newly discovered evidence. *State v. Franklin*, 7th Dist. No. 09MA96, 2010-Ohio-4317, ¶17. However, Appellant's motion fails to establish that the witnesses that she intends to call at a new trial were not available for the criminal trial.

{35} While it is true that the depositions from the civil trial were not available prior to the criminal trial, Appellant could have subpoenaed all of the witnesses that provided testimony in the civil trial. In fact, one of the deponents, Linda Call, a neighbor, actually testified at the criminal trial. Consequently, Appellant has not established that she was unavoidably prevented from discovering the testimony offered in the civil trial by way of deposition.

{36} Even if Appellant demonstrated that she could not have discovered the evidence prior to the criminal trial, the deposition testimony from the civil trial is not likely to change the outcome of the criminal trial, as it does not contradict evidence presented in the criminal matter. The civil deponents claim that when they visited

Hoopes in June of 2004 his injuries were not visible and he did not tell them that he was being abused by Appellant. T.I. testified that Hoopes' injuries in May and June were only visible when his shirt was removed for his "baths." Appellant has not cited any testimony that the civil deponents were present during those occasions. Likewise, although the civil testimony establishes that Hoopes did not tell any of his visitors that Appellant was abusing him, there was testimony offered at the criminal trial that Appellant had convinced Hoopes that he would go to jail if he reported the abuse. (Tr., p. 351.) Consequently, even if a jury credited the testimony of the civil deponents, it is consistent with the testimony offered at his criminal trial.

{37} In summary, Appellant has failed to demonstrate that she was unavoidably prevented from discovering the witness testimony from the civil trial prior to her criminal trial, or that the testimony, if admitted in a new criminal trial, would change the outcome of the trial. Therefore, her first assignment of error is overruled.

ASSIGNMENT OF ERROR NUMBER TWO

{38} "THE TRIAL COURT DENIED DEFENDANT/APPELLANT A DUE PROCESS RIGHT BY FAILING TO PROVIDE DEFENDANT/APPELLANT WITH EXPERT [SIC] TO ASSIST HER AT HER SENTENCING HEARING."

{39} In *State v. Mason* (1998), 82 Ohio St.3d 144, 694 N.E.2d 932, the Ohio Supreme Court described the circumstances under which a trial judge is required to provide an indigent defendant funds for expert assistance:

{40} "[D]ue process, as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Section 16, Article I of the Ohio

Constitution, requires that an indigent criminal defendant be provided funds to obtain expert assistance at state expense only where the trial court finds, in the exercise of a sound discretion, that the defendant has made a particularized showing (1) of a reasonable probability that the requested expert would aid in his defense, and (2) that denial of the requested expert assistance would result in an unfair trial." Id. at 150.

{¶41} When considering these factors, the trial court must consider the value of the expert assistance to the defendant's representation at either the guilt or sentencing phase and the availability of alternative devices that would fulfill the same functions as the expert assistance sought. *State v. Jenkins* (1984), 15 Ohio St.3d 164, 473 N.E.2d 264, paragraph four of the syllabus.

{¶42} A determination on a defendant's motion for public payment of an expert witness lies within the discretion of the trial court. *State v. Brady*, 119 Ohio St.3d 375, 2008-Ohio-4493, at ¶23, citing *Mason* at 150. It will not be disturbed absent an abuse of that discretion.

{¶43} "Pursuant to *Ake* and *Mason*, it is appropriate for a court to consider the following factors in determining whether the provision of an expert witness is necessary: '(1) the effect on the defendant's private interest in the accuracy of the trial if the requested service is not provided, (2) the burden on the government's interest if the service is provided, and (3) the probable value of the additional service and the risk of error in the proceeding if the assistance is not provided.' " *Brady* at ¶22, quoting *Mason* at 149.

**{44}** Appellant contends that she was in the throws of a peginterferon-induced psychosis when she beat and mutilated Hoopes on July 7, 2004. However, Appellant conceded at the resentencing hearing that she did not assault anyone other than Hoopes while she was taking the drug. Her statement was consistent with T.I.'s trial testimony that she never attacked him, only Hoopes. Appellant also had the presence of mind to lie about the cause of Hoopes' injuries when the police arrived. Further, Greenwalt testified that Appellant bragged about the assault in October of 2004. Therefore, there was insufficient evidence on the record to establish that Appellant was suffering the side effects of the drug when she attacked Hoopes on July 7, 2004, and the trial court did not abuse its discretion when it denied Appellant's motion for an expert witness at sentencing. Accordingly, Appellant's second assignment of error is overruled.

<u>ASSIGNMENT OF ERROR NUMBER THREE</u>

**{45}** "THE TRIAL COURT DENIED DEFENDANT/APPELLANT A CONSTITUTIONAL RIGHT WHEN IT DENIED DEFENDANT/APPELLANT'S MOTION TO HAVE WITNESSES SUBPOENAED FOR THE SENTENCING HEARING."

**{46}** The Sixth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution provide that a criminal defendant shall have the right to compulsory process to procure the attendance of witnesses in their favor. *State v. Denis* (1997), 117 Ohio App.3d 442, 445, 690 N.E.2d 955. The Ohio counterpart to the Sixth Amendment is found in Article 1, Section 10 of the Ohio Constitution.

**{47}** We have observed, however, that "a defendant's right to present witnesses is subject to the rules of procedure and evidence created to ensure an equitable and credible determination of his guilt or innocence." *State v. Smith* (June 6, 2001), 7th Dist. No. 99 CA 256, *6, citing *Chambers v. Mississippi* (1973), 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297. Accordingly, in *State v. Clark*, 7th Dist. No. 07-MA-87, 2008-Ohio-1179, we recognized that the right of compulsory process is a trial right and may not be invoked at the sentencing hearing. Id., ¶59. Therefore, Appellant's third assignment of error should be overruled.

ASSIGNMENT OF ERROR NUMBER FOUR

**{48}** "THE TRIAL COURT ABUSED ITS DISCRETION AND FAILED TO MAKE THE STATUTORY FINDINGS NECESSARY FOR THE IMPOSITION OF NON-MANDATORY CONSECUTIVE SENTENCES."

**{49}** In her fourth assignment of error, Appellant contends that the trial court abused its discretion when it imposed consecutive sentences in this case without engaging in the judicial fact-finding mandated by R.C. 2929.14(E)(4). Appellant challenges the lack of judicial fact finding, however, she does not contend that the trial court abused its discretion when considering the purposes and goals of sentencing in R.C. 2929.11 or weighing the factors listed in R.C. 2929.12.

**{50}** Ohio courts have not been required to make factual findings since mandatory fact finding was severed from the statute in *State v. Foster*, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470. Appellant nonetheless urges us to

abandon *Foster* based upon the United States Supreme Court's decision in *Oregon v. Ice* (2009), __ U.S. __, 129 S.Ct. 711, 172 L.Ed.2d 517.

**{51}** In *Ice*, the U. S. Supreme Court upheld an Oregon statute that required judicial fact finding when imposing consecutive sentences. The Court concluded that the Sixth Amendment to the United States Constitution is not violated when states permit judges, rather than juries, to make the findings of facts necessary for the imposition of consecutive, rather than concurrent, sentences for multiple offenses. Id. at 716-720.

**{52}** Criminal defendants throughout Ohio have asserted that the holding in *Ice* abrogates *Foster* as it relates to consecutive sentences. Intermediate appellate courts, however, have expressed their intent to follow *Foster* until directly addressed by the Ohio Supreme Court. See *State v. Woodrey*, 12th Dist. No. CA2010-01-008, 2010-Ohio-4079, ¶30; *State v. Robinson*, 8th Dist. No. 92050, 2009-Ohio-3379, ¶29; *State v. Finn*, 6th Dist. Nos. L-09-1162, L-09-1163, 2010-Ohio-2004, at ¶10; *State v. Sabo*, 3d Dist. No. 14-09-33, 2010-Ohio-1261, at ¶34-42; *State v. Potter*, 10th Dist. No. 09AP-580, 2010-Ohio-372, at ¶7-8; *State v. Moncoveish*, 11th Dist. No.2008-P-0075, 2009-Ohio-6227, at ¶21; *State v. Starett*, 4th Dist. No. 07CA30, 2009-Ohio-744, at ¶35.

**{53}** During the pendency of this appeal, the Ohio Supreme Court resolved the issue in *State v. Hodge* (December 29, 2010), Slip Opinion No. 2010-Ohio-6320. In *Hodge*, the Court held that "[t]he United States Supreme Court's decision in [*Ice*] does not revive Ohio's former consecutive-sentencing statutory provisions, R.C.

2929.14(E)(4) and 2929.41(A), which were held unconstitutional in [Foster]." Id., paragraph two of the syllabus. The Supreme Court further held that '[t]rial court judges are not obligated to engage in judicial fact-finding prior to imposing consecutive sentences unless the General Assembly enacts new legislation requiring that findings be made." Id., paragraph three of the syllabus. Therefore, Appellant's fourth assignment of error is overruled based upon the Ohio Supreme Court's decision in *Hodge*.

ASSIGNMENT OF ERROR NUMBER FIVE

**{54}** "THE TRIAL COURT VIOLATED DUE PROCESS BY DENYING DEFENDANT/APPELLANT A SENTENCING JURY."

**{55}** Appellant's trial counsel states in his brief that he is advancing the fifth assignment of error at the behest of Appellant, pursuant to *Anders v. California* (1967), 386 U.S. 738, 87 S.Ct.1396, 18 L.Ed.2d 493. Appellant appears to assert that the *Foster* decision, insofar as it severed mandatory fact finding from the sentencing statutes, incorrectly interpreted the United States Supreme Court's intent in *Blakely v. Washington* (2004), 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403, *and Apprendi v. New Jersey* (2000), 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435.

**{56}** *Apprendi* involved a New Jersey hate crime statute that permitted a 20-year sentence, rather than the usual ten-year maximum, if the judge determined the crime was committed " 'with a purpose to intimidate * * * because of race, color, gender, handicap, religion, sexual orientation or ethnicity.' " Id. at 468-469. The United States Supreme Court concluded that Apprendi's sentence violated his Sixth

Amendment jury rights because it exceeded the statutory maximum sentence and was based upon judicial fact-finding. The *Apprendi* Court held that the jury, rather than the judge, must find all of the facts essential to punishment. "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 490.

{57} In *Blakely*, the defendant was sentenced to approximately three years more than the statutory maximum of the standard sentencing range because the judge determined Blakely had acted with "deliberate cruelty." Id. at 298. The facts supporting that finding were neither admitted by the defendant nor found by a jury. Thus, the judge could not have imposed the "exceptional" sentence based solely on the facts admitted in the guilty plea. Id. at 304. The United States Supreme Court extended the rule in *Apprendi* and defined the "statutory maximum" as "the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." (Emphasis omitted.) Id. at 303, 124 S.Ct. at 2537. "In other words, the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings." (Emphasis omitted.) Id. at 303-304, 124 S.Ct. at 2537. The Court determined Blakely's sentence violated his Sixth Amendment jury trial rights because a jury did not find the facts that authorized the "exceptional" sentence.

**{58}** In *Foster*, the Ohio Supreme Court held that R.C. 2929.14(E)(4) and 2929.41(A), which required the court, rather than a jury, to make certain findings prior to imposing consecutive sentences, was unconstitutional. *Foster* at ¶83. The Court in *Foster* also held that, those sections which created presumptive minimum or concurrent terms or required judicial fact-finding in order to overcome that presumption, which included R.C. 2929.14(B), 2919.19(B)(2), and 2929.41, were also unconstitutional. *Foster* at ¶97. In order to remedy this, the Ohio Supreme Court severed the offending sections from Ohio's statutory sentencing scheme by applying a severance remedy similar to that adopted in *United States v. Booker* (2005), 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621.

**{59}** In considering a remedy to the *Blakely* problem in *Foster*, the Ohio Supreme Court looked at three options: requiring sentencing juries; reducing sentences to minimum terms until the legislature could act; and severing the offending statutory sections. The Court chose the severance option. *Foster* is the law in Ohio. Hence, Appellant's fifth assignment of error is overruled.

**{60}** For the forgoing reasons, Appellant's five assignments of error are overruled and the judgment of the trial court is affirmed.

Vukovich, J., concurs.

DeGenaro, J., concurs.